## Matthews *v.* Bagnik et al., Appellants.

Argued March 6, 1945. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH and ROSS, JJ.

*Milford J. Meyer,* for appellants.

*John H. Price,* with him *Cole B. Price* and *James Rutherford,* for appellee.

Opinion by Baldrige, P. J., April 12, 1945:

The plaintiff brought this bill in equity alleging ownership of certain described land, covered by water, located in South Canaan Township, Wayne County. It is an artificial body of water known originally as Bronson's Pond, later as the reservoir of the Scranton Fishing Club, and now as Lake Quinsigmond. She averred that the defendants, their agents, employes, or guests have been trespassing intermittently upon, and using the water of, the lake. The defendants in their answer denied that the plaintiff is the owner of all the land mentioned in her bill and asserted a legal title to part thereof, and that they have riparian rights extending to the middle of the lake. They averred also that they have used the lake from 1905 to the present time adversely, continuously, notoriously, and hostilely for fishing, boating, swimming, cutting ice, that they permitted their friends and others to do likewise, and that they used the lake water for their stock and domestic purposes. The learned trial judge, after several hearings, filed an opinion in which all the issues involved were fully discussed. Definite findings of fact and conclusions of law were included therein, and a decree was entered granting plaintiff the relief she sought. His action will be affirmed.

About a century ago John Jessup and Gabriel Howell, predecessors in title of both parties to this action, were engaged in the lumbering business. To provide increased water power for a newly erected sawmill and a gristmill, they built a dam, which enlarged Bronson's Pond. In 1849 they purchased 5 tracts of land to be flooded. The boundaries of 4 of these tracts were fixed by the flow line of the lake, the surface of which was to be raised to a level of 3 feet 1 inch above "Pond Rock." The tract upon which the dam was located called for courses and distances. The others did not.

In 1937, J. Bailee Rutherford, a registered engineer, made surveys of the properties purchased by Jessup

and Howell and blueprints thereof were offered and read in evidence without objection. He testified that by using certain of the old deeds, which described the original flow line of the enlarged lake, and still older deeds in the chain of title, which contained calls for courses and distances, and also the original warrants, he was able to connect all these properties and to fix the original shore or flow line. During the winter of that year, he made on the ice of the lake a survey, which he superimposed upon the one he had made from the deeds, warrants, etc., and found that the present flow line coincides with the original.

The plaintiff on August 8, 1932, by deed recorded in Deed Book Vol. 135, p. 277, acquired her title from her mother, Fannie V. Steell. She and her husband had been record owners of this lake property since 1902, and had maintained a summer cottage nearby.

Mary Bagnik acquired title to the land defendants claim by deed dated December 6, 1905, and recorded in Wayne County, Deed Book Vol. 94, p. 252. She and her husband conveyed it to Anthony Bagnik, Jr. and Josephine Bagnik, by deed dated July 8, 1936, recorded in Deed Book Vol. 140, p. 462, reserving a life use to the husband, Anthony Bagnik. It is not contended that there has been any change in the shore line of the lake since 1905. The Bagniks' deeds give no courses or distances and describe the property as follows, to wit: "Bounded on the northwest by the reservoir of the Scranton Fishing Club [now Lake Quinsigmond]; on the northeast by the lands formerly of Hulda Carey, but now of B. F. Swingle; on the southeast by the main road leading from Archbald to South Canaan; and on the southwest by lands of John Beers, containing sixty acres, more or less." It will be noted that no mention is made of any water rights. The defendants introduced a map in evidence showing that 36.2 acres of their land was outside the flow line of, and projected the

remainder, 23.7 acres, of the claimed 60 acres into, the lake.

The learned court below calls attention to the fact that in examining the description in some of the old deeds of the defendants' predecessors, which were not printed in this record, he found that 91 acres, bounded on the northwest by the reservoir of the old Jessup and Howell mill property, were deeded in 1865, and in 1898 the same tract was conveyed and the acreage given then was 95 acres; that Hiram Swingle, the grantor in Mary Bagnik's deed, conveyed to Lester Kizer in 1900 the southeast portion containing 50 acres of the 91 acre tract, leaving Swingle with but 41 acres. In 1905 he deeded the remainder of the tract, designating it as containing 60 acres, to Mary Bagnik, one of the defendants, thus apparently showing an error in the acreage of defendants' land. Be that as it may, as the defendants' deeds call for the reservoir of the Scranton Fishing Club as their northwest boundary, they are not entitled to any land beyond that line.

It is a well recognized rule of law that if a deed describes land by natural boundaries, or if artificial permanent objects are mentioned as monuments, they control; even courses, distances and quantities of land called for must yield: *Large v. Penn,* 6 S. & R. 488; *Andrews v. Kissinger,* 60 Pa. Superior Ct. 599; *Collins v. Clough,* 222 Pa. 472, 71 A. 1077; *Miles Land Co. v. Hudson Coal Co.,* 246 Pa. 11, 91 A. 1061; *Keech et al. v. Delaware County Trust Co., Adm.,* 297 Pa. 442, 147 A. 96. The flow line of this unnavigable, private lake was the boundary of defendants' property. The description given in their deed is perfectly clear. The natural boundary called for is readily ascertainable and its location was definitely determined. They had no more right to claim property beyond that line than if this land had not been covered with water or to assert that their land overlapped B. F. Swingle's property on the northeast boundary.

We are fully aware that title to land bordering on a navigable stream extends to the low water marks, subject to certain public rights, and where land abuts on creeks and unnavigable rivers, the owner's title extends to the middle of the stream. In the case of an unnavigable pond or lake as here, when the land covered by water is owned by others and no riparian rights attach to the property bordering on the lake, if one attempts to exercise such rights, the use of the lake is as much a trespass as if an unauthorized entry were made upon the dry land: *Miller et al. v. Lutheran Conference and Camp Association,* 331 Pa. 241, 247, 200 A. 646.

It has been expressly held that the mere ownership of the strip of land gives no right of ownership in the pond or lake upon which it borders: *Baylor v. Decker,* 133 Pa. 168, 19 A. 351. Nor does ownership of land bordering on a lake confer a right upon the owner to fish in the lake, much less to give a license to others therefor.

We find no justification for defendants' claiming a title to the middle of the lake. They are entitled to the land within the boundaries called for in their deeds, but nothing more.

That brings us to the question of whether the defendants have acquired title to a portion of Lake Quinsigmond, or the right to use the waters thereof by prescription, as a result of usuage openly, notoriously, adversely, hostilely for more than 21 years.

Plaintiff and her witnesses testified, and the trial judge so found, that since 1902 the plaintiff and her parents have employed caretakers, who patrolled the lake, sometimes as frequently as twice a day. At various times these men warned and chased away the defendants or their guests from the waters of the lake and kept "no trespass" signs tacked to stakes and stumps that were in the water, located at conspicuous places so that they could be seen by the defendants and all

other possible trespassers. These notices were from time to time destroyed or carried away, but they were renewed. In 1926 Anthony Bagnik, Sr. was arrested and fined before a justice of the peace for tearing down one of these signs. Trespassers were not only driven off, but the boats used by them were captured and at times destroyed. Three times, in 1913, 1923, and 1934, the lake was drained. On each occasion the water was drawn off for a period of six weeks to three months. We cannot conceive of any further notice the plaintiff and her parents could have given of their title and right to possession of the lake. Certainly, nothing more was required. Furthermore, entry upon another one's land, whether to hunt, fish, or boat, does not give title thereto.

In *Camp Chicopee v. Eden,* 303 Pa. 150, 154 A. 305, where title to land covered by water was claimed by adverse possession by fishing, boating, cutting ice, etc. for the statutory period, the Supreme Court said that those acts could not be held as adverse to the claim of the owners, stating p. 155: "It is a novel proposition that the holder of a record title must from time to time make proclamation on every part of his land of his right thereto under penalty that he will lose it to an intruder if he does not ...... The owner thereof does not have to become amphibious and dwell part of the time in the lake in order to retain his title thereto ...... None of the things set up by the defendant nor all of them put together meet the requirements of the law to obtain title by adverse possession." See, also, *Shinn et al. v. Rosenberger et al.,* 347 Pa. 504, 32 A. 2d 747.

In *Miller et al. v. Lutheran Conference and Camp Association,* supra, relied upon by the defendants, the facts may be readily distinguished from those in the case at bar. There bathing privileges were granted, boat and bath houses, extending out into the water, were erected and a portion of the lake was fenced off, so that a com-

mercial business was notoriously and continuously conducted. Individuals and camp associations were allowed to use the water of the lake for over 21 years. The court stated, p. 248: "Certainly the casual use of a lake during a few months each year for boating and fishing could not develop into a title to such privileges by prescription. But here the exercise of the bathing right was not carried on sporadically ...... for their personal enjoyment, but systematically for commercial purposes in the purusit of which they conducted an extensive and profitable business enterprise." We do not think that decision was intended to disturb the long line of cases previously decided, many of which are cited in *Camp Chicopee v. Eden,* supra.

A careful consideration of the facts in this case convinces us that the learned trial judge below was correct in holding that the defendants did not acquire title to any land or any riparian rights or easements by prescription.

Decree of the court below is affirmed at appellants' costs.